JS 44 (Rev. 12/07)

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. (SEE INSTRUCTIONS ON THE REVERSE OF THE FORM.)

## I. (a) PLAINTIFFS
Marina Ayzenberg

**DEFENDANTS**
Andrew Mogilyansky, et al.

**(b)** County of Residence of First Listed Plaintiff    Bucks County, PA
(EXCEPT IN U.S. PLAINTIFF CASES)

County of Residence of First Listed Defendant    Bucks County, PA
(IN U.S. PLAINTIFF CASES ONLY)

NOTE:   IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE
           LAND INVOLVED.

**(c)** Attorney's (Firm Name, Address, and Telephone Number)

Ely Goldin, Esquire; Fox Rothschild, LLP; 10 Sentry Parkway, Suite 200, PO Box 3001, Blue Bell, PA 19422 (610) 397-7506509

Attorneys (If Known)

## II. BASIS OF JURISDICTION (Place an "X" in One Box Only)

☐ 1   U.S. Government
         Plaintiff

☒ 3   Federal Question
         (U.S. Government Not a Party)

☐ 2   U.S. Government
         Defendant

☐ 4   Diversity
         (Indicate Citizenship of Parties in Item III)

## III. CITIZENSHIP OF PRINCIPAL PARTIES(Place an "X" in One Box for Plaintiff
(For Diversity Cases Only)                         and One Box for Defendant)

|                                                  | PTF | DEF |                                                          | PTF | DEF |
|--------------------------------------------------|-----|-----|----------------------------------------------------------|-----|-----|
| Citizen of This State                            | ☐ 1 | ☐ 1 | Incorporated or Principal Place of Business In This State | ☐ 4 | ☐ 4 |
| Citizen of Another State                         | ☐ 2 | ☐ 2 | Incorporated and Principal Place of Business In Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country          | ☐ 3 | ☐ 3 | Foreign Nation                                           | ☐ 6 | ☐ 6 |

## IV. NATURE OF SUIT (Place an "X" in One Box Only)

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|----------|-------|--|--------------------|------------|----------------|
| ☐ 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | ☐ 610 Agriculture | ☐ 422 Appeal 28 USC 158 | ☐ 400 State Reapportionment |
| ☐ 120 Marine | ☐ 310 Airplane | ☐ 362 Personal Injury - | ☐ 620 Other Food & Drug | ☐ 423 Withdrawal | ☐ 410 Antitrust |
| ☐ 130 Miller Act | ☐ 315 Airplane Product | Med. Malpractice | ☐ 625 Drug Related Seizure | 28 USC 157 | ☐ 430 Banks and Banking |
| ☐ 140 Negotiable Instrument | Liability | ☐ 365 Personal Injury - | of Property 21 USC 881 | | ☐ 450 Commerce |
| ☐ 150 Recovery of Overpayment | ☐ 320 Assault, Libel & | Product Liability | ☐ 630 Liquor Laws | **PROPERTY RIGHTS** | ☐ 460 Deportation |
| & Enforcement of Judgment | Slander | ☐ 368 Asbestos Personal | ☐ 640 R.R. & Truck | ☐ 820 Copyrights | ☐ 470 Racketeer Influenced and |
| ☐ 151 Medicare Act | ☐ 330 Federal Employers' | Injury Product | ☐ 650 Airline Regs. | ☐ 830 Patent | Corrupt Organizations |
| ☐ 152 Recovery of Defaulted | Liability | Liability | ☐ 660 Occupational | ☐ 840 Trademark | ☐ 480 Consumer Credit |
| Student Loans | ☐ 340 Marine | **PERSONAL PROPERTY** | Safety/Health | | ☐ 490 Cable/Sat TV |
| (Excl. Veterans) | ☐ 345 Marine Product | ☐ 370 Other Fraud | ☐ 690 Other | | ☐ 810 Selective Service |
| ☐ 153 Recovery of Overpayment | Liability | ☐ 371 Truth in Lending | **LABOR** | **SOCIAL SECURITY** | ☐ 850 Securities/Commodities/ |
| of Veteran's Benefits | ☐ 350 Motor Vehicle | ☐ 380 Other Personal | ☐ 710 Fair Labor Standards | ☐ 861 HIA (1395ff) | Exchange |
| ☐ 160 Stockholders' Suits | ☐ 355 Motor Vehicle | Property Damage | Act | ☐ 862 Black Lung (923) | ☐ 875 Customer Challenge |
| ☐ 190 Other Contract | Product Liability | ☐ 385 Property Damage | ☐ 720 Labor/Mgmt. Relations | ☐ 863 DIWC/DIWW (405(g)) | 12 USC 3410 |
| ☐ 195 Contract Product Liability | ☐ 360 Other Personal | Product Liability | ☐ 730 Labor/Mgmt.Reporting | ☐ 864 SSID Title XVI | ☐ 890 Other Statutory Actions |
| ☐ 196 Franchise | Injury | | & Disclosure Act | ☐ 865 RSI (405(g)) | ☐ 891 Agricultural Acts |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | ☐ 740 Railway Labor Act | **FEDERAL TAX SUITS** | ☐ 892 Economic Stabilization Act |
| ☐ 210 Land Condemnation | ☐ 441 Voting | ☐ 510 Motions to Vacate | ☐ 790 Other Labor Litigation | ☐ 870 Taxes (U.S. Plaintiff | ☐ 893 Environmental Matters |
| ☐ 220 Foreclosure | ☐ 442 Employment | Sentence | ☐ 791 Empl. Ret. Inc. | or Defendant) | ☐ 894 Energy Allocation Act |
| ☐ 230 Rent Lease & Ejectment | ☐ 443 Housing/ | **Habeas Corpus:** | Security Act | ☐ 871 IRS—Third Party | ☐ 895 Freedom of Information |
| ☐ 240 Torts to Land | Accommodations | ☐ 530 General | | 26 USC 7609 | Act |
| ☐ 245 Tort Product Liability | ☐ 444 Welfare | ☐ 535 Death Penalty | **IMMIGRATION** | | ☐ 900Appeal of Fee Determination |
| ☐ 290 All Other Real Property | ☐ 445 Amer. w/Disabilities - | ☐ 540 Mandamus & Other | ☐ 462 Naturalization Application | | Under Equal Access |
| | Employment | ☐ 550 Civil Rights | ☐ 463 Habeas Corpus - | | to Justice |
| | ☐ 446 Amer. w/Disabilities - | ☐ 555 Prison Condition | Alien Detainee | | ☐ 950 Constitutionality of |
| | Other | | ☐ 465 Other Immigration | | State Statutes |
| | ☒ 440 Other Civil Rights | | Actions | | |

## V. ORIGIN (Place an "X" in One Box Only)

☒ 1 Original
       Proceeding

☐ 2 Removed from
       State Court

☐ 3 Remanded from
       Appellate Court

☐ 4 Reinstated or
       Reopened

☐ 5 Transferred from
       another district
       (specify)

☐ 6 Multidistrict
       Litigation

☐ 7 Appeal to District
       Judge from
       Magistrate
       Judgment

## VI. CAUSE OF ACTION
Cite the U.S. Civil Statute under which you are filing (Do not cite jurisdictional statutes unless diversity):
42 USC 1983
Brief description of cause:
Malicious Prosecution

## VII. REQUESTED IN
COMPLAINT:
☐ CHECK IF THIS IS A CLASS ACTION
    UNDER F.R.C.P. 23

DEMAND $

CHECK YES only if demanded in complaint:
JURY DEMAND:   ☐ Yes   ☐ No

## VIII. RELATED CASE(S)
IF ANY
(See instructions):
JUDGE _____

DOCKET NUMBER _____

DATE
7/15/08

SIGNATURE OF ATTORNEY OF RECORD

**FOR OFFICE USE ONLY**

RECEIPT # _____   AMOUNT _____   APPLYING IFP _____   JUDGE _____   MAG. JUDGE _____

APPENDIX I

**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

**<u>CASE MANAGEMENT TRACK DESIGNATION FORM</u>**

| | | |
|---|---|---|
| MARINA AYZENBERG | : | CIVIL ACTION |
| | : | |
| v. | : | |
| | : | |
| ANDREW MOGILYANSKY , ET AL. | : | NO. |

In accordance with the Civil Justice Expense and Delay Reduction Plan of this court, counsel for plaintiff shall complete a case Management Track Designation Form in all civil cases at the time of filing the complaint and serve a copy on all defendants. (See § 1:03 of the plan set forth on the reverse side of this form.)  In the event that a defendant does not agree with the plaintiff regarding said designation, that defendant shall, with its first appearance, submit to the clerk of court and serve on the plaintiff and all other parties, a case management track designation form specifying the track to which that defendant believes the case should be assigned.

**SELECT ONE OF THE FOLLOWING CASE MANAGEMENT TRACKS:**

(a)  Habeas Corpus – Cases brought under 28 U.S.C. §2241 through §2255.                ( )

(b)  Social Security – Cases requesting review of a decision of the Secretary of Health
    and Human Services denying plaintiff Social Security Benefits                ( )

(c)  Arbitration – Cases required to be designated for arbitration under Local Civil Rule 53.2.  ( )

(d)  Asbestos – Cases involving claims for personal injury or property damage from
    exposure to asbestos.                ( )

(e)  Special Management – Cases that do not fall into tracks (a) through (d) that are
    commonly referred to as complex and that need special or intense management by
    the court.  (See reverse side of this form for a detailed explanation of special
    management cases.)                ( )

(f)  Standard Management – Cases that do not fall into any one of the other tracks.      ( X )

| | | |
|---|---|---|
| July 15, 2008 | _(signature)_ | Plaintiff |
| **Date** | **Attorney-at-law** | **Attorney for** |
| (610) 397-6509 | 610-397-0450 | egoldin@foxrothschild.com |
| **Telephone** | **FAX Number** | **E-Mail Address** |

(Civ. 660) 10/02

## UNITED STATES DISTRICT COURT

**FOR THE EASTERN DISTRICT OF PENNSYLVANIA — DESIGNATION FORM** to be used by counsel to indicate the category of the case for the purpose of assignment to appropriate calendar.

Address of Plaintiff: Post Office Box 85, Southampton, PA 18954

Address of Defendant: 395 Worthington Mill Road, Richboro , PA 18954

Place of Accident, Incident or Transaction: Bucks County, Pennsylvania
*(Use Reverse Side For Additional Space)*

Does this civil action involve a nongovernmental corporate party with any parent corporation and any publicly held corporation owning 10% or more of its stock?

(Attach two copies of the Disclosure Statement Form in accordance with Fed.R.Civ.P. 7.1(a))     Yes☐   No☒

Does this case involve multidistrict litigation possibilities?     Yes☐   No☒

*RELATED CASE, IF ANY:*

Case Number: _____ Judge _____ Date Terminated: _____

Civil cases are deemed related when yes is answered to any of the following questions:

1. Is this case related to property included in an earlier numbered suit pending or within one year previously terminated action in this court?

Yes☐   No☐

2. Does this case involve the same issue of fact or grow out of the same transaction as a prior suit pending or within one year previously terminated action in this court?

Yes☐   No☐

3. Does this case involve the validity or infringement of a patent already in suit or any earlier numbered case pending or within one year previously terminated action in this court?

Yes☐   No☐

4. Is this case a second or successive habeas corpus, social security appeal, or pro se civil rights case filed by the same individual?

Yes☐   No☐

CIVIL: (Place ✔ in ONE CATEGORY ONLY)

A. *Federal Question Cases:*

1. ☐ Indemnity Contract, Marine Contract, and All Other Contracts
2. ☐ FELA
3. ☐ Jones Act-Personal Injury
4. ☐ Antitrust
5. ☐ Patent
6. ☐ Labor-Management Relations
7. ☒ Civil Rights
8. ☐ Habeas Corpus
9. ☐ Securities Act(s) Cases
10. ☐ Social Security Review Cases
11. ☐ All other Federal Question Cases
    (Please specify)

B. *Diversity Jurisdiction Cases:*

1. ☐ Insurance Contract and Other Contracts
2. ☐ Airplane Personal Injury
3. ☐ Assault, Defamation
4. ☐ Marine Personal Injury
5. ☐ Motor Vehicle Personal Injury
6. ☐ Other Personal Injury (Please specify)
7. ☐ Products Liability
8. ☐ Products Liability — Asbestos
9. ☒ All other Diversity Cases

(Please specify)   ==Abuse==

## ARBITRATION CERTIFICATION
*(Check appropriate Category)*

I, Ely Goldin, Esq. , counsel of record do hereby certify:

☐ Pursuant to Local Civil Rule 53.2, Section 3(c)(2), that to the best of my knowledge and belief, the damages recoverable in this civil action case exceed the sum of $150,000.00 exclusive of interest and costs;

☐ Relief other than monetary damages is sought.

DATE: 7/15/08 _____ _____
        Attorney-at-Law             Attorney I.D.#   75937

**NOTE:** A trial de novo will be a trial by jury only if there has been compliance with F.R.C.P. 38.

I certify that, to my knowledge, the within case is not related to any case now pending or within one year previously terminated action in this court except as noted above.

DATE: 7/15/08 _____ _____
        Attorney-at-Law             Attorney I.D.#   75937

CIV. 609 (6/08)

UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| MARINA AYZENBERG, | ) | |
| | ) | |
| | ) | |
| | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action No. 08-CV-_____ |
| | ) | |
| ANDREW MOGILYANSKY | ) | |
| a/k/a ANDER MOG | ) | |
| a/k/a ANDREW MOGILYAN | ) | |
| a/k/a DMITRI SANCHDNKO | ) | |
| a/k/a V. YANSKY | ) | |
| a/k/a SURGE ZUEV | ) | |
| a/k/a ANDREI SENCHENKO | ) | |
| a/k/a ANDRE GLUSCHUK | ) | |
| a/k/a ALEX GUL | ) | |
| a/k/a ALEX GLUS, | ) | |
| MICHAEL J. REED, ESQUIRE | ) | |
| SERGEY NAUMOVSKY, | ) | |
| ROBERT J. GLEICHERT | ) | |
| | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

## COMPLAINT

Plaintiff, by and through her undersigned counsel and pursuant to Fed.R.Civ.P. 8(a)(2) file this Complaint against the defendants herein and in support of the Complaint aver as follows:

### JURISDICTION AND VENUE

1.      This Court has original subject matter jurisdiction over all claims pursuant to 28 U.S.C. §§ 1331.

2.      This Court has personal jurisdiction over each of the Defendants.  Defendants have conducted business in, and have had continuous and systematic contacts with, the Commonwealth of Pennsylvania, including the Eastern District of Pennsylvania.  The wrongful activity in this case

concerns the Defendants' purposeful interactions with individuals in the Commonwealth of Pennsylvania, including within the Eastern District of Pennsylvania. Defendants have also committed wrongful acts and have caused injury to Plaintiff in Pennsylvania and, in particular, the Eastern District of Pennsylvania.   Thus, each of the Defendants have purposefully availed themselves of the privilege of doing business in Pennsylvania, and critical elements of Defendants' wrongdoing occurred in this Commonwealth.

3.      Venue is proper in this District pursuant to 28 U.S.C. §§ 1391(b) and (c) in that a substantial part of the events or omissions giving rise to the claims herein occurred in this District, a substantial part of the property that is the subject of the action is situated in this District, and Defendants have sufficient contacts with this District such that defendants may be found here.

## THE PARTIES

4.      Plaintiff  Marina Ayzenberg is an adult individual and is resident of Northampton Township, Bucks County, Pennsylvania.   Plaintiff's mailing address is Post Office Box 85, Southampton, PA 18954.

5.      Defendant Andrew Mogilyansky is an adult individual and is a resident of Northampton Township, Bucks County, Pennsylvania who resides at 395 Worthington Mill Rd, Richboro, PA 18954.

6.      Defendant Michael J. Reed, Esquire is an adult individual and is a resident of Chester County, Pennsylvania.   Said Defendant is an attorney-at-law who maintains a principal place of business at 45 Darby Road, Paoli, PA 19301.

7.      Defendant Sergey Naumovsky is an adult individual and is a resident of Southampton Township, Bucks County, Pennsylvania, who resides at 25 Heather Valley Road, Southampton, PA 18966.

8.      Defendant Robert J. Gleichert is an adult individual who resides at 1120 Cheston Lane, Queenstown, MD 21658.

## OPERATIVE FACTS

**A.      Background.**

9.      This case has its genesis in a questionable real estate transaction that dates back to the year 2000 and which relates to a certain 6.2 acre lot in Chester County being tax parcel no. 66-3-1.01 (the "Chester County Property")

10.      In or around May 24, 2000, Defendant Robert Gleichert ("Gleichert") conveyed the Chester County Property to Len Polichuk ("Polichuk") and Serge Naumovsky ("Naumovsky"), as tenants in common, for the sum of $369,000.

11.      Polichuk and Naumovsky were, at that time, business partners in an automobile dealership known as Dunphy Nissan.   Polichuk is the husband of the plaintiff herein.

12.      The Chester County Property was subject to a first mortgage held by Washington Mutual Savings Bank ("WAMU").

13.      In or around 2004 WAMU commenced a mortgage foreclosure action against Polichuk and Naumovsky and the Chester County Property based on a default on the first mortgage.

14.      On or about May 7, 2004, Defendant Andrew Mogilyansky ("Mogilyansky") purchased the property out of foreclosure thereby becoming the sole record owner of the Chester County Property.

15.      On or about November 9, 2004, Defendant Gleichert filed a civil action in the Court of Common Pleas of Chester County against Polichuk, Naumovsky and Mogilyansky seeking to quiet title in the Chester County Property (the "Quiet Title Action").

16.     In the Quiet Title Action, Gleichert alleged that he had never conveyed in fee the entire 6.2 acre lot to Polichuk and Naumovsky. Rather, Gleichert alleged that he had intended to convey only that portion of the property which contained an existing structure known as 870 West Street Road, West Chester, Pennsylvania which consisted of approximately 2.3 acres.

17.     Gleichert further claimed that he had conveyed the entire lot solely as an accommodation to Polichuk and Naumovsky so that they could obtain a mortgage.

18.     Although Gleichert drew a distinction for purposes of his Quiet Title Action between the 2.3 acre lot on which the house stood and the largely vacant 3.9 acre lot, in fact both lots were actually and legally one undivided piece of real estate. Therefore, to secure a mortgage, Polichuk and Naumovsky would have to appear as record owners as to the entire undivided 6.2 acre lot.

19.     In support of his claim, Gleichert produced a promissory note purportedly dated July 11, 2000  (the "Note") under which Polichuk and Naumovsky (together with certain other guarantors) agreed to pay Gleichert $260,000 and interest at the rate of  9.5% per month. See, Exhibit "A."

20.     According to Gleichert, this instrument evidenced an agreement as between him and Polichuk and Naumovsky that the later were going to subdivide and re-convey the largely vacant 3.9 acre lot back to him at some point in the future. Furthermore, according to Gleichert, if the lot was not re-conveyed back, the note operated as security.

21.     Mogilyansky engaged the services of one Michael J. Reed, Esquire ("Reed") to represent his interests in the Quiet Title Action.

22.     Plaintiff believes and therefore avers that Mogilyansky disputed Gleichert's claims in the Quiet Title Action and, regardless of the claims, Mogilyansky took the position that he was a

bona fide purchaser for value who purchased the Chester County Property out of foreclosure and therefore had valid title to the entire undivided 6.2 acre lot.

23.     This is where the plot thickens.

24.     On or about June 16, 2006 Naumovsky's estranged wife, Maria Naumovsky, sent a letter to Gleichert's counsel in the Quiet Title Action indicating that in fact Mogilyansky was not a bona fide purchaser for value.  She further informed Gleichert's counsel that  Mogilyansky and Naumovsky were business partners and had orchestrated the foreclosure and transfer to Mogilyansky as a means of extinguishing any potential reversionary right that Gleichert may have with regard to the Chester County Property and securing a windfall.  See, Exhibit "B".

25.     As a result, plaintiff believes and therefore avers that Mogilyansky's status as a b.f.p. was called into doubt and Plaintiff believes and therefore avers that in light of the revelations made by Naumovsky's wife, Mogilyansky's defense was materially weakened and he was forced to settle.

26.     On or about February 5, 2007, Mogilyansky and Gleichert executed a Settlement Agreement pursuant to which they agreed to subdivide the Chester County Property into three lots. Lots 1 and 2 consisted of approximately 3.9 acres (largely vacant) and Lot 3 was the 2.3 acre lot on which the 870 West Street Road, West Chester, Pennsylvania home was erected.

27.     Contingent on the subdivision, Gleichert received Lots 1 and 2, which happen to be that portion of the Chester County which, according to him, he had never intended to convey. Mogilyansky received Lot 3, $125,000 and a limited "assignment of all rights and claims derived from and given by Judgment Note of July 11, 2000."  A true and correct copy of the Settlement Agreement is attached as Exhibit "C".

28.     The settlement agreement appears to have contemplated a future assignment by "Gleichert" of his rights and claims derived from the Note.  However, even as of the settlement date,

-5-

Gleichert had no claims to assign.  According to Gleichert, the Note operated as security for the reconveyance of the 3.9 acres which he claims to have constructively owned even after conveying the entire undivided lot to Naumovsky and Polichuk.   Inasmuch as Gleichert received title to his reversionary interest in the Chester County Property, the obligations under the Note, if any, were extinguished.  Put simply, Gleichert could not have both the property and the Note which acted as security for the property.

29.     Once the settlement was signed, the payback began.

30.     Plaintiff believes and therefore avers that Mogilyansky was convinced that Polichuk put Naumovsky's wife up to sending the letter that destroyed Mogilyansky's argument that he purchased the Chester County Property as an innocent bona fide purchaser for value.  In retaliation, Mogilyansky embarked on a legal campaign designed to ruin Polichuk and his family.

31.     To that end, as soon as the Gleichert-Mogilyansky settlement agreement was executed Mogilyansky instructed his lawyer, Michael J. Reed, Esquire ("Reed"), to confess judgment against Polichuk under the Note.

**B.     The Bucks County Confessed Judgment.**

32.     On or about February 8, 2007, Defendant Reed entered his appearance on behalf of Gleichert (who just days before had been Mogilyasnky's adversary) and  filed a Complaint in Confession of Judgment in Gleichert's name, against Polichuk, in the Court of Common Pleas of Bucks County, thereby causing judgment in the amount of $508,008.71 to be entered against Plaintiff's husband and Naumovsky.

33.     As of February 8, 2007, Gleichert had not yet assigned his rights under the Note, if any, to Mogilyansky.  However, Mogilyansky and his lawyer, Defendant Reed, went ahead and filed the Complaint in confession thus causing judgment to be confessed in favor of Gleichert.

34.     The Complaint in Confession filed in Bucks County named Naumovsky as a defendant as well.  However, in actuality Naumovsky and/or his assets were never at risk and, at all times relevant hereto, Naumovsky cooperated and/or conspired with Mogilyansky in the actions complained of herein.  Naumovsky's name was included in the pleading to give the confessed judgment the false appearance of legitimacy.

35.     The February 8, 2007 Confessed Judgment was ultimately opened by the Court on December 12, 2007.  However, notwithstanding the fact that the Confessed Judgment was opened, between February 8, 2007 and December 12, 2007, Mogilyansky, by his and through his manipulation of Gleichert and the Bucks County Confessed Judgment litigation, used and abused the civil execution process to intentionally harm the Plaintiff' interests.

36.     Specifically, despite the fact that Polichuk filed a Petition to Open and/or Strike the Confessed Judgment on February 26, 2007 and filed an Amended Petition to Open and/or Strike the Confessed Judgment and to Stay Execution on March 12, 2007, on or about April 11, 2007, Defendant, Mogilyansky, now acting as the assignee and/or other party in interest, filed a Writ of Execution and discovery in aid of execution upon Plaintiff and a number of entities and/or financial institutions including, without limitation, Dynamic Funding Solutions, Inc., Fox Lake Realty, LP, Metro Developments, Inc., and Charles Schwab & Company.

37.     As a result of the execution process which was used and abused by Defendant, Mogilyansky, and while multiple Petitions to Open and/or Strike the Judgment and/or requests to stay execution were pending before the Court, Mogilyansky dramatically interfered with the Plaintiff's ability to carry on with business in the ordinary course and further caused Plaintiff's financial institutions to freeze her bank accounts.

38.     In addition, Mogilyansky disseminated Writs of Execution and discovery in aid of execution to individuals who Mogilyansky knew owed no funds to the judgment debtor in the Bucks County Confessed Judgment Action and who were not "garnishees" within the meaning of the Pennsylvania Rules of Civil Procedure.   Rather, Mogilyansky through Reed purposefully disseminated the Writ to humiliate the Plaintiff and her family or to simultaneously send a message to others who had business relationships with Mogilyansky that he possessed the power to manipulate the legal system and that any attempts by these individuals to oppose Mogilyansky would be met with legal proceedings filed by his endless team of lawyers.

39.     Furthermore, despite knowing that his claims would never withstand true legal scrutiny, Mogilyansky did everything in his power to frustrate efforts by the judgment debtor in the Bucks County Confessed Judgment litigation to uncover the factual basis for Defendant Mogilyansky's claims and his involvement in the Bucks County Confessed Judgment litigation.

40.     To that end, Mogilyansky evaded discovery efforts which would shed light on the frivolous nature of his claims and through the ensuing delay kept the Bucks County litigation alive and the fraudulent judgment confessed of record while continuing to misuse execution procedures.

C.     **The Delaware County Transfers**.

41.     On June 4, 2007, while Petitions to Open and/or Strike the Confessed Judgment filed by Polichuk in the Bucks County Confessed Judgment Action were pending, and while efforts were being taken by Polichuk to depose Defendant Mogilyansky and expose the frivolousness of the confessed judgment, Mogilyansky – as the true party in interest – by and through Defendant Reed, registered the $508,000 Confessed Judgment in the Court of Common Pleas of Delaware County under Docket No. 07-07009.

42.     On or about that same date, Defendants caused a Writ of Execution to issue instructing the Sheriff of Delaware County, Pennsylvania to attach the property of Plaintiff's Husband in the possession of Charles Schwab & Co., Inc. at 100 West Lancaster Avenue, Wayne, PA 19087. A true and correct copy of the Writ of Execution is attached herewith as <u>Exhibit "E"</u>.

43.     The Writ provided, in relevant part, that:

> ***An attachment has been issued on all accounts owned or controlled by the defendants regardless of how named.***

44.     Pursuant to instructions communicated by Defendants to the Sheriff of Delaware County for purposes of execution, the Sheriff of Delaware County levied upon certain brokerage accounts owned by the Plaintiff in her own right and by Plaintiff as custodian (the "Custodial Accounts").

45.     In fact, no attachment had issued "on all accounts owned or controlled by the defendants regardless of how named" in the jurisdiction where the judgment had been confessed.

46.     Simultaneously with the registration of the Judgment in Delaware County, on or about June 13, 2007, Mogilyansky – as the true party in interest – by and through his attorney, registered the $508,000 Confessed Judgment in the Court of Common Pleas of Philadelphia County.

47.     In total, Mogilyansky instructed the Sheriffs of at least three (3) different counties to simultaneously serve garnishment proceedings on the plaintiff herein, all of which stem from a highly tenuous confessed judgment that Mogilyansky maintained just long enough to do some real damage.

48.     By reason of Defendant Mogilyansky's actions, sheriffs, constables and other process servers acting under color of state law, were dispatched to the plaintiff's home, her place of employment, her financial institutions, her friends, family members and acquaintances and to places of business in which Plaintiff had absolutely no interest.

49.     But it didn't end there.

**D.      The "Naumovsky" Action**

50.     On or about August 7, 2007 Defendant Mogilyansky caused co-Defendant Naumovsky to commence and/or maintain a civil action in the Court of Common Pleas of Philadelphia against, inter alia, Plaintiff Marina Ayzenberg under Docket Number July Term, 2007 No. 4750 (the "Naumovsky Action").

51.     Upon information and belief, Defendant Mogilyansky directed, controlled and/or financed the Naumovsky Action.  In fact, on October 18, 2007, Mogilyansky's counsel, Defendant Reed herein, entered his appearance on behalf of Defendant Naumovsky and has, both prior to and subsequent to the entry date, controlled and/or directed Naumovsky's actions therein.

**E.      The Non-Prossed Fraudulent Conveyance Action**

52.     Furthermore, on or about October 4, 2007, Defendant, Mogilyansky, using an address of 395 Worthington Mill Road, Richboro, PA 19854 by and through his attorney, Michael J. Reed, commenced yet another action in the Court of Common Pleas of Philadelphia County against Plaintiff, Metro Development, LLC, Dynamic Funding Solutions, Inc., Fox Lake Realty, LP, Andrei Polnet and LAML Management, Inc.

53.     At the time of filing, Defendant, Mogilyansky, did not assert legitimate claims upon which recovery could be maintained as against the Plaintiff herein.

54.     Rather, once again it was the Defendants' intention to use the lawsuit and the vexing effect of process issued in connection with the lawsuit as a leverage to extort concessions from the Plaintiff in other business transactions to which he was not legally entitled.

55.     In fact, Mogilyansky made no effort to effectuate service of the Complaint upon Plaintiff in accordance with the Pennsylvania Rules of Civil Procedure between October 4, 2007 and

-10-

March 12, 2008. Instead, during this time period, he informally informed the Plaintiff that the lawsuit had been filed, without making official service as required by the Pennsylvania Rules of Civil Procedure, and used the pendency of this lawsuit to place himself in a better position with regard to his other dealings with the Plaintiff and/or her husband.

56.     Furthermore, Defendants purposefully circulated news that a lawsuit implicating Plaintiff in real estate fraud had been filed throughout the Russian immigrant community in Northeast Philadelphia, Bucks and Montgomery Counties with the specific intent of embarrassing and harming the Plaintiff herein.

57.     On or about March 12, 2008, an Order was entered by the Honorable Esther R. Sylvester of the Court of Common Pleas of Philadelphia County dismissing the Complaint due to Mogilyansky's failure to appear at a Court ordered Case Management Conference.

58.     The dismissal of the Complaint constitutes a favorable outcome for purposes of Plaintiff's claim under the Dragonetti Act as set forth herein.

**F.     Effect of Executions and Pending Litigation.**

59.     As set forth above, between February 8, 2007, the date on which Defendants confessed judgment against Plaintiff's Husband in the Court of Common Pleas of Bucks County, and December 12, 2007, the date on which the Court of Common Pleas of Bucks County opened the Confessed Judgment, Defendants grossly misused and abused the civil execution process to willfully harm the interests of the Plaintiff herein.

60.     During the aforementioned time frame, Defendants issued and re-issued Writs of Execution as against the plaintiff's bank and investment accounts, custodial accounts held by the plaintiff for the benefit of her children and businesses in which Plaintiff (but not her husband) were involved. The language of the writs had been distorted to create the false appearance that a

sweeping attachment had issued or constructive trust had been imposed when, in fact, the opposite was true.

61.     The Sheriffs of Bucks, Philadelphia and Delaware Counties, acting under instructions of the Defendants under color of state law, delivered Defendants' process upon the plaintiff's residence, her place of business, and upon her banking and financial institutions with who she had a relationship.

62.     Defendants used the improperly issued writs not only to freeze funds to which they had absolutely no legal right but to also unlawfully obtain private and confidential personal financial information concerning the plaintiff which constituted the private and confidential affairs of the plaintiff and to which the Defendants had no legal right.  Defendant Mogilyansky disseminated the wrongfully obtained information to other parties who were potentially adverse to Plaintiff and/or her husband as means of furthering the unlawful and unjustified retaliation complained of herein.

63.     In many cases, the defendants intentionally directed the Sheriffs of Bucks, Delaware and Philadelphia Counties to deliver execution process to addresses occupied by Plaintiff's friends, family members and/or business acquaintances not for the purpose of effectuating a levy or attachment but to simply embarrass and/or harass the plaintiff and/or her family.

64.     Defendants have used the legal system to harass, vex and annoy the Plaintiff herein and to secure concessions from the Plaintiff and/or persons and/or businesses related to and/or affiliated with the Plaintiff, to which the defendants were not otherwise entitled.

65.     The foregoing acts were undertaken with actual malice.

## COUNT I
## PLAINTIFF v. ALL DEFENDANTS
## (42 U.S.C. § 1983)

66.     Plaintiff incorporate by reference the preceding paragraphs of this Complaint as if set forth at length herein.

67.     At all times relevant hereto, Defendants were state actors within the meaning of the Civil Rights Act of 1864, 42 U.S.C. § 1983 (the "Ku Klux Klan Act") in regard to their misuse of the execution and/or garnishment powers conferred by state law to, inter alia, garnish and/or levy the accounts of the Plaintiff herein, to satisfy the confessed judgment which was illegal and invalid and which was ultimately opened by the Court of Common Pleas of Bucks County.

68.     By reason of said Defendants' unlawful actions undertaken under color of state law, Plaintiff has been harmed as heretofore alleged.

69.     As private actors acting under color of state law, Defendants are not entitled to assert qualified immunity as a defense in this action.

## COUNT II
## PLAINTIFF v. ALL DEFENDANTS
## (ABUSE OF PROCESS)

70.     Plaintiff incorporates by reference the preceding paragraphs of this Complaint as if set forth at length herein.

71.     Defendants initiated and continued with legal proceedings and ancillary process with the intention using said proceedings not to achieve legitimate objectives but to advance the personal agenda of Defendant A. Mogilyansky and to otherwise harm and embarrass the Plaintiff herein.

72.     Defendants' motivation in initiating and continuing with the aforementioned legal proceedings was unjust, vexatious, and frivolous.

73.     Plaintiff has suffered damage as a result of Defendants' conduct.

74.     Defendants' actions are willful wanton and outrageous and justify the award of punitive damages.

<div align="center">

**COUNT III**
**PLAINTIFF v. ALL DEFENDANTS**
**(WRONGFUL USE OF CIVIL PROCEEDINGS)**

</div>

75.     Plaintiff incorporates by reference the preceding paragraphs of this Complaint as if set forth at length herein.

76.     Defendants initiated civil proceedings against the plaintiff herein without probable cause and/or reasonable basis to do so.

77.     The civil proceedings were terminated in favor of the plaintiff herein.

78.     Plaintiff has suffered damage as a result of Defendants' conduct.

79.     Defendants' actions are willful wanton and outrageous and justify the award of punitive damages.

<div align="center">

**COUNT IV**
**PLAINTIFF v. ALL DEFENDANTS**
**(CIVIL CONSPIRACY)**

</div>

80.     Plaintiff incorporates by reference the preceding paragraphs of this Complaint as if set forth at length herein.

81.     By reason of the aforesaid, the defendants – consisting of two or more persons – combined and/or agreed with malicious intent to engage in unlawful overt acts and/or achieve objections by unlawful means complained of herein to the great harm and detriment to the Plaintiff.

82.     In addition to the foregoing, it is alleged and therefore averred that Defendant Gleichert knew or should have known of Mogilyansky's intentions in seeking the assignment of Gleichert's rights, if any, under the Note.  Furthermore, Gleichert permitted Mogilyansky and Reed

<div align="center">-14-</div>

to utilize him as a Plaintiff in the Bucks County Confessed Judgment Action to help perpetuate the appearance of legitimacy in what was an otherwise sham proceeding.

83.     Defendant Gleichert is liable with the other defendants named herein for all harm sustained by the Plaintiff as a consequence of the original confessed judgment, in which Gleichert was materially involved and in the subsequent execution and/or ancillary litigation all of which grew out of the original confessed judgment.

84.     Defendants' actions are willful wanton and outrageous and justify the award of punitive damages.

## COUNT V
## PLAINTIFF v. ALL DEFENDANTS
## (CONVERSION THROUGH WRONGFUL EXECUTION)

85.     Plaintiff incorporates by reference the preceding paragraphs of this Complaint as if set forth at length herein.

86.     Defendants made material misrepresentations in connection with the aforementioned execution proceedings to the Sherriff of Delaware County and/or other jurisdictions by incorrectly and/or falsely indicating that an "*an attachment has been issued on all accounts owned or controlled by the defendants regardless of how named*" when, in fact, no such attachment had issued.

87.     By reason of the aforesaid material misrepresentations, which were made by the Defendants in their capacity as judgment creditors invoking the official execution process authorized by Pennsylvania law, assets of the Plaintiff were wrongfully attached and the interests of the plaintiff were harmed.

## COUNT VI
## PLAINTIFF v. ALL DEFENDANTS
## (TORTIOUS INTERFERENCE WITH PROSPECTIVE BUSINESS RELATIONS)

88.     Plaintiff incorporates by reference the preceding paragraphs of this Complaint as if set forth at length herein.

89.     By reason of the aforesaid, Defendants have intentionally interfered with Plaintiff's actual and/or prospective business relationships.

90.     Plaintiff has suffered damage as a result of Defendants' conduct.

91.     Defendants' actions are willful wanton and outrageous and justify the award of punitive damages.

## COUNT VII
## PLAINTIFF  v. ALL DEFENDANTS
## (INFLICTION OF EMOTIONAL DISTRESS)

92.     Plaintiff incorporates by reference the preceding paragraphs of this Complaint as if set forth at length herein.

93.     Defendants  negligently,  recklessly  and/or  intentionally  engaged  in  outrageous conduct which has caused plaintiff to suffer severe emotional distress.

94.     Plaintiff has suffered damage as a result of Defendants' conduct.

95.     Defendants'  actions  are  willful  wanton  and  outrageous  and  justify  the  award  of punitive damages.

## DAMAGES

96.     By reason of the aforesaid, Plaintiff(s) has been harmed as follows:

(a)     Plaintiff Marina Ayzenberg was unable to refinance the mortgage on her primary residence to a more favorable rate as a result of legal proceedings initiated by the defendants herein;

-16-

(b)     Plaintiff was deprived of the opportunity to make use of certain funds which were wrongfully attached by reason of defendants' unlawful conduct;

(c)     Plaintiff suffered humiliation, anxiety and a loss of reputation and standing;

(d)     Plaintiff has been forced to incur legal fees and costs by reason of the defendants' unlawful conduct;

(e)     Plaintiff has been prevented from furthering her legitimate business interests.

## **REQUEST FOR RELIEF**

**WHEREFORE**, Plaintiff pray for judgment against Defendants, jointly and severally, as follows:

1.     Compensatory damages in excess of $75,000;

2.     Punitive damages in such amount as may be deemed just and equitable but in no event less than $1,000,000;

3.     For Plaintiff's costs, including reasonable attorneys' fees, pursuant to 42 U.S.C. § 1988;

4.     For pre and post-judgment interest according to law.

5.     For such other and further relief as the Court may deem just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury of all issues so triable.


Respectfully submitted,


_____
Ely Goldin, Esquire
Attorney I.D. No. 75937
FOX ROTHSCHILD LLP
10 Sentry Parkway, Suite 200
Post Office Box 3001
Blue Bell, PA 19422
(215) 397-6500

Attorney for Plaintiff


July 15, 2008



### 6. MORTGAGE CONTINGENCY (1-00)

☒ WAIVED. This sale is NOT contingent on Buyer obtaining mortgage financing.

☐ ELECTED

(A) This sale is contingent upon Buyer obtaining mortgage financing as follows:

1. Amount of mortgage loan $_____
2. Minimum Term _____ years
3. Type of mortgage _____
4. Interest rate _____ %; however, Buyer agrees to accept the interest rate as may be committed by the mortgage lender, not to exceed a maximum interest rate of _____ %.
5. Discount points, loan origination, loan placement and other fees charged by the lender as a percentage of the mortgage loan (excluding any mortgage insurance premiums or VA funding fee) not to exceed _____ % of the mortgage loan.

The interest rate and fees provisions required by Buyer are satisfied if a mortgage lender makes available to Buyer the right to guarantee an interest rate at or below the Maximum Interest Rate specified herein with the percentage fees at or below the amount specified herein. Buyer gives Seller the right, at Seller's sole option and as permitted by the lending institution and applicable laws, to contribute financially, without promise of reimbursement, to the Buyer and/or lender to make the above terms available to Buyer.

(B) Within 10 days of the execution of this Agreement, Buyer will make a completed, written mortgage application to a responsible mortgage lending institution. **The Selling Broker, if any, otherwise the Listing Broker, is authorized to communicate with the lender for the purposes of assisting in the mortgage loan process.**

(C) 1. Upon receipt of a mortgage commitment, Buyer and/or Selling Broker will promptly deliver a copy of the commitment to Listing Broker, if any, otherwise to Seller.

2. Mortgage commitment date _____ . If a written commitment is not received by Listing Broker, if any, otherwise by Seller, by the above date, Buyer and Seller agree to extend the commitment date until Seller terminates this Agreement in writing.

3. Seller has the option to terminate this Agreement in writing, on or after the mortgage commitment date, if the mortgage commitment:
   a. Is not valid until the date of settlement, OR
   b. Is conditioned upon the sale and settlement of any other property, OR
   c. Contains any other condition not specified in this Agreement.

4. In the event Seller does not terminate this Agreement as provided above, Buyer has the option to terminate this Agreement in writing if the mortgage commitment:
   a. Is not obtained by or valid until the date of settlement, OR
   b. Is conditioned upon the sale and settlement of any other property which do not occur by the date of settlement, OR
   c. Contains any other condition not specified in this Agreement which Buyer is unable to satisfy by the date of settlement.

5. If this Agreement is terminated as specified in paragraphs 6 (C) (2), (3) or (4), all deposit monies paid on account of purchase price will be returned to Buyer. Buyer will be responsible for any premiums for mechanics lien insurance and/or title search, or fee for cancellation of same, if any; AND/OR any premiums for flood insurance and/or fire insurance with extended coverage, insurance binder charges or cancellation fee, if any; AND/OR any appraisal fees and charges paid in advance to mortgage lender.

(D) If the mortgage lender requires repairs to the Property, Buyer will, upon receipt, deliver a copy of the mortgage lender's requirements to Listing Broker, if any, otherwise to Seller. Seller will, within 5 days of receipt of the lender's requirements, notify Buyer whether Seller will make the required repairs at Seller's expense.

1. If Seller chooses to make repairs, Buyer will accept the Property and agree to the RELEASE set forth in paragraph 25 of this Agreement.

2. If Seller chooses not to make the required repairs, Buyer will, within 5 days, notify Seller in writing of Buyer's choice to terminate this Agreement OR make the required repairs at Buyer's expense and with Seller's permission, which will not be unreasonably withheld. If Seller denies Buyer permission to make the required repairs, Buyer may, within 5 days of Seller's denial, terminate this Agreement. If Buyer terminates this Agreement, all deposit monies paid on account of purchase price will be returned promptly to Buyer and this Agreement will be VOID.

(E) Seller Assist
   ☒ NOT APPLICABLE
   ☐ APPLICABLE. Seller will pay:
      ☐ $_____ , maximum, toward Buyer's costs as permitted by the mortgage lender.
      ☐ _____

#### FHA/VA, IF APPLICABLE

(F) It is expressly agreed that notwithstanding any other provisions of this contract, Buyer will not be obligated to complete the purchase of the Property described herein or to incur any penalty by forfeiture of earnest money deposits or otherwise unless Buyer has been given, in accordance with HUD/FHA or VA requirements, a written statement by the Federal Housing Commissioner, Veterans Administration, or a Direct Endorsement Lender setting forth the appraised value of the Property of not less than $ _____ (the dollar amount to be inserted is the sales price as stated in this Agreement). Buyer will have the privilege and option of proceeding with consummation of the contract without regard to the amount of the appraised valuation. The appraised valuation is arrived at to determine the maximum mortgage the Department of Housing and Urban Development will insure. HUD does not warrant the value nor the condition of the Property. Buyer should satisfy himself/herself that the price and condition of the Property are acceptable.

**Warning:** Section 1010 of Title 18, U.S.C., Department of Housing and Urban Development provides, "Whoever for the purpose of . . . influencing in any way the action of such department . . . makes, passes, utters or publishes any statement knowing the same to be false . . . shall be fined not more than $5,000 or imprisoned not more than two years, or both."

(G) U.S. Department of Housing and Urban Development (HUD) NOTICE TO PURCHASERS:

   **Buyer's Acknowledgement**
   ☐ Buyer has received the HUD Notice "For Your Protection: Get a Home Inspection" (see Notices and Information on Property Condition Inspections). Buyer understands the importance of getting an independent home inspection and has thought about this before signing this Agreement.

   **Buyer's Initials** _____    **Date** _____

(H) Certification   We the undersigned, Seller(s) and Buyer(s) party to this transaction each certify that the terms of this contract for purchase are true to the best of our knowledge and belief, and that any other agreement entered into by any of these parties in connection with this transaction is attached to this Agreement.

### 7. INSPECTIONS (1-98)

(A) Seller hereby agrees to permit inspections by authorized appraisers, reputable certifiers, insurer's representatives, surveyors, municipal officials and/or Buyer as may be required by the lending institutions, if any, or insuring agencies. Seller further agrees to permit any other inspections required by or provided for in the terms of this Agreement.

(B) Buyer reserves the right to make a pre-settlement walk-through inspection of the Property. Buyer's right to make this inspection is not waived by any other provision of this Agreement.

(C) Seller will have heating and all utilities (including fuel(s)) on for the inspections.

Buyer Initials: _____    A/S-2K Page 2 of 8    Seller Initials: _____

Case ... Document ... Filed 07/23/... Page 24 of 42

**8. PROPERTY INSPECTION CONTINGENCY (1-00)**

☐ WAIVED. Buyer understands that Buyer has the option to request inspections of the Property (see Property Inspection and Environmental Notices). BUYER WAIVES THIS OPTION and agrees to the RELEASE set forth in paragraph 25 of this Agreement.

☒ ELECTED

(A) Within 15 days of the execution of this Agreement, Buyer, at Buyer's expense, may choose to have inspections and/or certifications completed by licensed or otherwise qualified professionals (see Property Inspection and Environmental Notices). This contingency does not apply to the following existing conditions and/or items:

(B) Other provisions of this Agreement may provide for inspections and/or certifications that are not waived or altered by Buyer's election here.

(C) If Buyer is not satisfied with the condition of the Property as stated in any written report, Buyer will, within the time given for completing inspections:

☒ **Option 1**
　1. Accept the Property with the information stated in the report(s) and agree to the RELEASE set forth in paragraph 25 of this Agreement, OR
　2. Terminate the Agreement in writing by notice to Listing Broker, if any, otherwise to Seller, within the time given for inspection, in which case all deposit monies paid on account of purchase price will be returned promptly to Buyer and this Agreement will be VOID.

☐ **Option 2**
　1. Accept the Property with the information stated in the report(s) and agree to the RELEASE set forth in paragraph 25 of this Agreement, UNLESS the total cost to correct the conditions contained in the report(s) is more than $ _____.
　2. If the total cost to correct the conditions contained in the report(s) EXCEEDS the amount specified in paragraph 8(C) (Option 2) 1, Buyer will deliver the report(s) to Listing Broker, if any, otherwise to Seller, within the time given for inspection.
　　a. Seller will, within _____ days of receiving the report(s), inform Buyer in writing of Seller's choice to:
　　　(1) Make repairs before settlement so that the remaining cost to repair conditions contained in the report(s) is less than or equal to the amount specified in paragraph 8 (C) (Option 2) 1.
　　　(2) Credit Buyer at settlement for the difference between the estimated cost of repairing the conditions contained in the report(s) and the amount specified in paragraph 8 (C) (Option 2) 1. (This option must be acceptable to the mortgage lender, if any.
　　　(3) Not make repairs and not credit Buyer at settlement for any defects in conditions contained in the report(s).
　　b. If Seller chooses to make repairs or credit Buyer at settlement as specified in paragraph 8 (C) (Option 2) 2, Buyer will accept the Property and agree to the RELEASE set forth in paragraph 25 of this Agreement.
　　c. If Seller chooses not to make repairs and not to credit Buyer at settlement, or if Seller fails to choose any option within the time given, Buyer will, within _____ days:
　　　(1) Accept the Property with the information stated in the report(s) and agree to the RELEASE set forth in paragraph 25 of this Agreement, OR
　　　(2) Terminate the Agreement in writing by notice to Listing Broker, if any, otherwise to Seller, in which case all deposit monies paid on account of purchase price will be returned promptly to Buyer and this Agreement will be VOID.

**9. WOOD INFESTATION CONTINGENCY (1-00)**

☐ WAIVED. Buyer understands that Buyer has the option to request that the Property be inspected for wood infestation by a certified Pest Control Operator. BUYER WAIVES THIS OPTION and agrees to the RELEASE set forth in paragraph 25 of this Agreement.

☒ ELECTED

(A) Within 20 days of the execution of this Agreement, Buyer, at Buyer's expense, will obtain a written "Wood-Destroying Insect Infestation Inspection Report" from a certified Pest Control Operator and will deliver it and all supporting documents and drawings provided by the Pest Control Operator to Listing Broker, if any, otherwise to Seller. The report is to be made satisfactory to and in compliance with applicable laws, mortgage and lending institutions, and/or Federal Insuring and Guaranteeing Agency requirements, if any. The inspection will include all readily visible and accessible areas of all structures on the Property except the following structures, which will not be inspected: _____ NO EXCEPTIONS.

(B) If the inspection reveals evidence of active infestation(s), Seller agrees, at Seller's expense and before settlement, to treat for active infestation(s), in accordance with applicable laws.

(C) If the inspection reveals damage from active infestation(s) or previous infestation(s), Buyer, at Buyer's expense, has the option to obtain a written report by a professional contractor, home inspection service, or structural engineer that is limited to structural damage to the Property caused by wood-destroying organisms and a proposal to repair the damage. Buyer will deliver the structural damage report and corrective proposal to Listing Broker, if any, otherwise to Seller, within 3 days of delivering the original inspection report.

(D) Within 5 days of receiving the structural damage report and corrective proposal, Seller will advise Buyer whether Seller will repair, at Seller's expense and before settlement, any structural damage from active or previous infestation(s).

(E) If Seller chooses to repair structural damage revealed by the report, Buyer agrees to accept the Property as repaired and agrees to the RELEASE set forth in paragraph 25 of this Agreement.

(F) If Seller chooses not to repair structural damage revealed by the report or fails to respond within the time given, Buyer, within 5 days of receiving Seller's notice, will notify Seller in writing of Buyer's choice to:
　1. Accept the Property with the defects revealed by the inspection, without abatement of price and agree to the RELEASE set forth in paragraph 25 of this Agreement, OR
　2. Make the repairs before settlement, if required by the mortgage lender, if any, at Buyer's expense and with Seller's permission, which will not be unreasonably withheld, in which case Buyer accepts the Property and agrees to the RELEASE set forth in paragraph 25 of this Agreement. If Seller denies Buyer permission to make the repairs, Buyer may, within 5 days of Seller's denial, terminate this Agreement. If Buyer terminates this Agreement, all deposit monies paid on account of purchase price shall be returned promptly to Buyer and this Agreement will be VOID, OR
　3. Terminate this Agreement, in which case all deposit monies paid on account of purchase price will be returned promptly to Buyer and this Agreement will be VOID.

**10. RESIDENTIAL LEAD-BASED PAINT HAZARD REDUCTION ACT NOTICE REQUIRED FOR PROPERTIES BUILT BEFORE 1978 (1-00)**

☐ NOT APPLICABLE
☒ APPLICABLE

(A) Seller represents that: (check 1 OR 2)
☒ 1. Seller has no knowledge concerning the presence of lead-based paint and/or lead-based paint hazards in or about the Property.
☐ 2. Seller has knowledge of the presence of lead-based paint and/or lead-based paint hazards in or about the Property. (Provide the basis for determining that lead-based paint and/or hazards exist, the location(s), the condition of the painted surfaces, and other available information concerning Seller's knowledge of the presence of lead-based paint and/or lead-based paint hazards.) _____

(B) Records/Reports (check 1 OR 2)
☒ 1. Seller has no reports or records pertaining to lead-based paint and/or lead-based paint hazards in or about the Property.
☐ 2. Seller has provided Buyer with all available records and reports pertaining to lead-based paint and/or lead-based paint hazards in or about the Property. (List documents) _____

(C) Buyer's Acknowledgement
☒ 1. Buyer has received the pamphlet *Protect Your Family from Lead in Your Home* and has read the Lead Warning Statement contained in this Agreement (See Environmental Notices).
　　Buyer's Initials _____ Date _____
☐ 2. Buyer has reviewed Seller's disclosure of known lead-based paint and/or lead-based paint hazards, as identified in paragraph 10(A) and has received the records and reports pertaining to lead-based paint and/or lead-based paint hazards identified in paragraph 10(B).
　　Buyer's Initials _____ Date _____

**(D)  RISK ASSESSMENT/INSPECTION:** Buyer acknowledges that before Buyer is obligated to buy a residential dwelling built before 1978, Buyer has a 10-day period (unless Buyer and Seller agree in writing to a different period of time) to conduct a risk assessment or inspection of the Property for the presence of lead-based paint and/or lead-based paint hazards.

[X]  WAIVED. Buyer understands that Buyer has the right to conduct a risk assessment or inspection of the Property to determine the presence of lead-based paint and/or lead-based paint hazards. BUYER WAIVES THIS RIGHT and agrees to the RELEASE set forth in paragraph 25 of this Agreement.

[ ]  ELECTED

   1.  Buyer, at Buyer's expense, chooses to obtain a risk assessment and/or inspection of the Property for lead-based paint and/or lead-based paint hazards. The risk assessment and/or inspection will be completed within _____ days of the execution of this Agreement (insert "10" unless Buyer and Seller agree to a different period of time).

   2.  Within the time set forth above for obtaining the risk assessment and/or inspection of the Property for lead-based paint and/or lead-based paint hazards, Buyer may deliver to Listing Broker, if any, otherwise to Seller, a written list of the specific hazardous conditions cited in the report and those corrections requested by Buyer, along with a copy of the risk assessment and/or inspection report.

   3.  Seller may, within _____ days of receiving the list and report(s), submit a written corrective proposal to Buyer. The corrective proposal will include, but not be limited to, the name of the remediation company and a completion date for corrective measures. Seller will provide certification from a risk assessor or inspector that corrective measures have been made satisfactorily on or before the completion date.

   4.  Upon receiving the corrective proposal, Buyer, within 5 days, will:

      a.  Accept the corrective proposal and the Property in writing, and agree to the RELEASE set forth in paragraph 25 of this Agreement, OR

      b.  Terminate this Agreement in writing, in which case all deposit monies paid on account of purchase price will be returned promptly to Buyer and this Agreement will be VOID.

   5.  Should Seller fail to submit a written corrective proposal within the time set forth in paragraph 10(D)3 of this Agreement, then Buyer, within 5 days, will:

      a.  Accept the Property in writing, and agree to the RELEASE set forth in paragraph 25 of this Agreement, OR

      b.  Terminate this Agreement in writing, in which case all deposit monies paid on account of purchase price will be returned promptly to Buyer and this Agreement will be VOID.

**(E)  Certification**  By signing this Agreement, Buyer and Seller certify the accuracy of their respective statements, to the best of their knowledge.

**11.  RADON CONTINGENCY (1-00)**

**(A)**  Seller represents that: (check appropriate response(s))

[ ]  1.  Seller has no knowledge concerning the presence or absence of radon.

[ ]  2.  Seller has knowledge that the Property was tested on the dates, by the methods (e.g., charcoal canister, alpha track, etc.), and with the results of all tests indicated below:

| DATE | TYPE OF TEST | RESULTS (picocuries/liter or working levels) |
|------|--------------|----------------------------------------------|
| _____ | _____ | _____ |
| _____ | _____ | _____ |
| _____ | _____ | _____ |

      COPIES OF ALL AVAILABLE TEST REPORTS will be delivered to Buyer with this Agreement. SELLER DOES NOT WARRANT EITHER THE METHODS OR RESULTS OF THE TESTS.

[ ]  3.  Seller has knowledge that the Property underwent radon reduction measures on the date(s) and by the method(s) indicated below:

| DATE | RADON REDUCTION METHOD |
|------|------------------------|
| _____ | _____ |
| _____ | _____ |

[ ]  WAIVED. Buyer understands that Buyer has the option to request that the Property be inspected for radon by a certified inspector (see Radon Notice). BUYER WAIVES THIS OPTION and agrees to the RELEASE set forth in paragraph 25 of this Agreement.

**(B)** [X]  ELECTED

Buyer, at Buyer's expense, has the option to obtain, from a certified inspector, a radon test of the Property and will deliver a copy of the test report to Listing Broker, if any, otherwise to Seller, within _10_ days of the execution of this Agreement. (See Radon Notice.)

   1.  If the test report reveals the presence of radon below 0.02 working levels (4 picocuries/liter), Buyer accepts the Property and agrees to the RELEASE set forth in paragraph 25 of this Agreement.

   2.  If the test report reveals the presence of radon at or exceeding 0.02 working levels (4 picocuries/liter), Buyer will, within _____ days of receipt of the test results:

[X]  Option 1

      a.  Accept the Property in writing and agree to the RELEASE set forth in paragraph 25 of this Agreement, OR

      b.  Terminate this Agreement in writing, in which case all deposit monies paid on account of purchase price will be returned promptly to Buyer and this Agreement will be VOID, OR

      c.  Submit a written, corrective proposal to Listing Broker, if any, otherwise to Seller. The corrective proposal will include, but not be limited to, the name of the certified mitigation company; provisions for payment, including retests; and completion date for corrective measures.

        (1)  Within 5 days of receiving the corrective proposal, Seller will:

          (a)  Agree to the terms of the corrective proposal in writing, in which case Buyer accepts the Property and agrees to the RELEASE set forth in paragraph 25 of this Agreement, OR

          (b)  Not agree to the terms of the corrective proposal.

        (2)  Should Seller not agree to the terms of the corrective proposal or fail to respond within the time given, Buyer will, within 5 days, elect to:

          (a)  Accept the Property in writing and agree to the RELEASE set forth in paragraph 25 of this Agreement, OR

          (b)  Terminate this Agreement in writing, in which case all deposit monies paid on account of purchase price will be returned promptly to Buyer and this Agreement will be VOID.

[ ]  Option 2

      a.  Accept the Property in writing and agree to the RELEASE set forth in paragraph 25 of this Agreement, OR

      b.  Submit a written, corrective proposal to Listing Broker, if any, otherwise to Seller. The corrective proposal will include, but not be limited to, the name of the certified mitigation company; provisions for payment, including retests; and completion date for corrective measures. Seller will pay a maximum of $ _____ toward the total cost of remediation and retests, which will be completed by settlement.

        (1)  If the total cost of remediation and retests EXCEEDS the amount specified in paragraph 11(B) (Option 2) b, Seller will, within 5 days of receipt of the cost of remediation, notify Buyer in writing of Seller's choice to:

          (a)  Pay for the total cost of remediation and retests, in which case Buyer accepts the Property and agrees to the RELEASE set forth in paragraph 25 of this Agreement, OR

          (b)  Not pay for the total cost of remediation and retests.

        (2)  If Seller chooses not to pay for the total cost of remediation and retests, or if Seller fails to choose either option within the time given, Buyer will, within 5 days, notify Seller in writing of Buyer's choice to:

          (a)  Pay the difference between Seller's contribution to remediation and retests and the actual cost thereof, in which case Buyer accepts the Property and agrees to the RELEASE set forth in paragraph 25 of this Agreement, OR

          (b)  Terminate this Agreement, in which case all deposit monies paid on account of purchase price will be returned promptly to Buyer and this Agreement will be VOID.

Buyer Initials: _____        A/S-2K Page 4 of 8        Seller Initials: _____

**12. STATUS OF WATER (1-00)**

    (A) Seller represents that property is served by:

        ☐ Public Water

        ☒ On-site Water

        ☐ Community Water

        ☐ None

        ☐

    (B) **WATER SERVICE INSPECTION CONTINGENCY**

        ☐ WAIVED. Buyer acknowledges that Buyer has the option to request an inspection of the water service for the Property. BUYER WAIVES THIS OPTION and agrees to the RELEASE set forth in paragraph 25 of this Agreement.

        ☒ ELECTED

        1. Buyer has the option, within _15 BUS._ days of the execution of this Agreement and at Buyer's expense, to deliver to Listing Broker, if any, otherwise to Seller, a written inspection report by a qualified, professional water testing company of the quality and/or quantity of the water service.

        2. Seller agrees to locate and provide access to the on-site (or individual) water system, if applicable, at Seller's expense, if required by the inspection company. Seller also agrees to restore the Property prior to settlement.

        3. If the report reveals that the water service does not meet the minimum standards of any applicable governmental authority and/or fails to satisfy the requirements for quality and/or quantity set by the mortgage lender, if any, then Seller will, within __3__ days of receipt of the report, notify Buyer in writing of Seller's choice to:

            a. Upgrade the water service to the minimum acceptable levels, before settlement, in which case Buyer accepts the Property and agrees to the RELEASE set forth in paragraph 25 of this Agreement, OR

            b. Not upgrade the water service.

        4. If Seller chooses not to upgrade the service to minimum acceptable levels, or fails to respond within the time given, Buyer will, within __3__ days, either:

            a. Accept the Property and the water service and, if required by the mortgage lender, if any, and/or any governmental authority, upgrade the water service before settlement or within the time required by the mortgage lender, if any, and/or any governmental authority, at Buyer's expense and with Seller's permission, which will not be unreasonably withheld, and agree to the RELEASE set forth in paragraph 25 of this Agreement. If Seller denies Buyer permission to upgrade the water service, Buyer may, within 5 days of Seller's denial, terminate this Agreement. If Buyer terminates this Agreement, all deposit monies paid on account of purchase price will be returned promptly to Buyer and this Agreement will be VOID, OR

            b. Terminate this Agreement, in which case all deposit monies paid on account of purchase price will be returned promptly to Buyer and this Agreement will be VOID.

**13. STATUS OF SEWER (1-00)**

    (A) Seller represents that property is served by:

        ☐ Public Sewer

        ☒ Individual On-lot Sewage Disposal System (See Sewage Notice 1)

        ☒ Individual On-lot Sewage Disposal System in Proximity to Well (See Sewage Notice 1; see Sewage Notice 4, if applicable)

        ☐ Community Sewage Disposal System

        ☐ Ten-acre Permit Exemption (See Sewage Notice 2)

        ☐ Holding Tank (See Sewage Notice 3)

        ☐ None (See Sewage Notice 1)

        ☐ None Available/Permit Limitations in Effect (See Sewage Notice 5)

        ☐

    (B) **INDIVIDUAL ON-LOT SEWAGE DISPOSAL INSPECTION CONTINGENCY**

        ☐ WAIVED. Buyer acknowledges that Buyer has the option to request an inspection of the individual on-lot sewage disposal inspection of the Property. BUYER WAIVES THIS OPTION and agrees to the RELEASE set forth in paragraph 25 of this Agreement.

        ☒ ELECTED

        1. Buyer has the option, within _15 BUS._ days of the execution of this Agreement and at Buyer's expense, to deliver to Listing Broker, if any, otherwise to Seller, a written inspection report by a qualified, professional inspector of the individual on-lot sewage disposal system.

        2. Seller agrees to locate and provide access to the individual on-lot sewage disposal system, and, if required by the inspection company, empty the septic tank, at Seller's expense. Seller also agrees to restore the Property prior to settlement.

        3. If the report reveals defects that do not require expansion or replacement of the existing sewage disposal system, Seller will, within __3__ days of receipt of the report, notify Buyer in writing of Seller's choice to:

            a. Correct the defects before settlement, including retests, at Seller's expense, in which case Buyer accepts the Property and agrees to the RELEASE set forth in paragraph 25 of this Agreement, OR

            b. Not correct the defects, or if Seller fails to respond within the time given, Buyer will, within __3__ days, either:

               (1) Accept the Property and the system and, if required by the mortgage lender, if any, and/or any governmental authority, correct the defects before settlement or within the time required by the mortgage lender, if any, and/or any governmental authority, at Buyer's sole expense and with Seller's permission, which will not be unreasonably withheld, and agree to the RELEASE set forth in paragraph 25 of this Agreement. If Seller denies Buyer permission to correct the defects, Buyer may, within 5 days of Seller's denial, terminate this Agreement. If Buyer terminates this Agreement, all deposit monies paid on account of purchase price will be returned promptly to Buyer and this Agreement will be VOID, OR

               (2) Terminate this Agreement in writing, in which case all deposit monies paid on account of purchase price will be returned promptly to Buyer and this Agreement will be VOID.

        4. If the report reveals the need to expand or replace the existing individual on-lot sewage disposal system, Seller may, within __3__ days of the report, submit a corrective proposal to Selling Broker, if any, otherwise to Buyer. The corrective proposal will include, but not be limited to, the name of the remediation company; provisions for payment, including retests; and completion date for corrective measures. Within 5 days of receiving Seller's corrective proposal, or if no corrective proposal is received within the time given, Buyer will:

            a. Agree to the terms of the corrective proposal, if any, in writing, in which case Buyer accepts the Property and agrees to the RELEASE set forth in paragraph 25 of this Agreement, OR

            b. Accept the Property and the system and, if required by the mortgage lender, if any, and/or any governmental authority, correct the defects before settlement or within the time required by the mortgage lender, if any, and/or any governmental authority, at Buyer's sole expense and with Seller's permission, which will not be unreasonably withheld, and agree to the RELEASE set forth in paragraph 25 of this Agreement. If Seller denies Buyer permission to correct the defects, Buyer may, within 5 days of Seller's denial, terminate this Agreement. If Buyer terminates this Agreement, all deposit monies paid on account of purchase price will be returned promptly to Buyer and this Agreement will be VOID, OR

            c. Terminate this Agreement in writing, in which case all deposit monies paid on account of purchase price will be returned promptly to Buyer and this Agreement will be VOID.

**14. NOTICES, ASSESSMENTS & CERTIFICATES OF OCCUPANCY (1-00)**

    (A) Seller represents as of Seller's execution of this Agreement, that no public improvement, condominium or homeowner association assessments have been made against the Property which remain unpaid and that no notice by any government or public authority has been served upon Seller or anyone on Seller's behalf, including notices relating to violations of zoning, housing, building, safety or fire ordinances which remain uncorrected, and that Seller knows of no condition that would constitute violation of any such ordinances which remains uncorrected, unless otherwise specified here: _____

(B) Seller knows of no other potential notices (including violations) and assessments except as follows: _____

(C) In the event any notices (including violations) and assessments are received since the execution of this Agreement and before settlement, Seller will notify Buyer in writing, within 5 days of receiving the notice or assessment, that Seller will:

    1. Comply with notices and assessments at Seller's expense, in which case Buyer accepts the Property and agrees to the RELEASE set forth in paragraph 25 of this Agreement, OR

    2. NOT comply with notices and assessments at Seller's expense, in which case Buyer will notify Seller within 5 days in writing that Buyer will:

        a. Comply with notices and assessments at Buyer's expense and agree to the RELEASE set forth in paragraph 25 of this Agreement, OR

        b. Terminate this Agreement, in which case all deposit monies paid on account of purchase price will be returned promptly to Buyer and this Agreement will be VOID.

        If Buyer fails to notify Seller within the time given, Buyer accepts the Property and agrees to the RELEASE set forth in paragraph 25 of this Agreement.

(D) Buyer is advised that access to a public road may require issuance of a highway occupancy permit from the Department of Transportation.

(E) If required by law, within _____ days of the execution of this Agreement, Seller will order for delivery to Selling Broker, if any, otherwise to Buyer, on or before settlement:

    1. A certification from the appropriate municipal department or departments disclosing notice of any uncorrected violation of zoning, housing, building, safety or fire ordinances, AND/OR

    2. A certificate permitting occupancy of the Property. In the event repairs/improvements are required for the issuance of the certificate, Seller will, within 5 days of Seller's receipt of the requirements, notify Buyer of the requirements and whether Seller will make the required repairs/improvements at Seller's expense.

    If Seller chooses not to make the required repairs/improvements, Buyer will, within 5 days, notify Seller in writing of Buyer's choice to terminate this Agreement OR make the repairs/improvements at Buyer's expense with Seller's permission, which will not be unreasonably withheld. If Seller denies Buyer permission to make the required repairs, Buyer may, within 5 days of Seller's denial, terminate this Agreement. If Buyer terminates this Agreement, all deposit monies paid on account of purchase price will be returned promptly to Buyer and this Agreement will be VOID.

### 15. TITLE, SURVEYS & COSTS (1-00)

(A) The Property is to be conveyed free and clear of all liens, encumbrances, and easements, EXCEPTING HOWEVER the following: existing deed restrictions, historic preservation restrictions or ordinances, building restrictions, ordinances, easements of roads, easements visible upon the ground, easements of record, privileges or rights of public service companies, if any; otherwise the title to the above described real estate will be good and marketable and such as will be insured by a reputable Title Insurance Company at the regular rates.

(B) In the event Seller is unable to give a good and marketable title and such as will be insured by a reputable Title Company at the regular rates, as specified in paragraph 15(A), Buyer will have the option of taking such title as Seller can give without changing the price or of being repaid all monies paid by Buyer to Seller on account of purchase price and Seller will reimburse Buyer for any costs incurred by Buyer for those items specified in paragraph 15(C) and in paragraph 15(D) items (1), (2), (3); and in the latter event there will be no further liability or obligation on either of the parties hereto and this Agreement will become VOID.

(C) Any survey or surveys which may be required by the Title Insurance Company or the abstracting attorney, for the preparation of an adequate legal description of the Property (or the correction thereof), will be secured and paid for by Buyer. However, any survey or surveys desired by Buyer or required by the mortgage lender will be secured and paid for by Buyer.

(D) Buyer will pay for the following: (1) The premium for mechanics lien insurance and/or title search, or fee for cancellation of same, if any; (2) The premiums for flood insurance and/or fire insurance with extended coverage, insurance binder charges or cancellation fee, if any; (3) Appraisal fees and charges paid in advance to mortgage lender, if any; (4) Buyer's customary settlement costs and accruals.

### 16. ZONING CLASSIFICATION (1-00)

Failure of this Agreement to contain the zoning classification (except in cases where the property [and each parcel thereof, if subdividable] is zoned solely or primarily to permit single-family dwellings) will render this Agreement voidable at the option of the Buyer, and, if voided, any deposits tendered by the Buyer will be returned to the Buyer without any requirement for court action.

Zoning Classification: _____**Residential**_____

☐ ELECTED. Within _____ days of the execution of this Agreement, Buyer will verify that the existing use of the Property as _____ is permitted. In the event the use is not permitted, Buyer will, within the time given for verification, notify Listing Broker, if any, otherwise Seller, in writing that the existing use of the Property is not permitted and this Agreement will be VOID, in which case all deposit monies paid on account of purchase price will be returned promptly to Buyer. Buyer's failure to respond within the time given will constitute a WAIVER of this contingency and all other terms of this Agreement remain in full force and effect.

### 17. COAL NOTICE

☒ NOT APPLICABLE

☐ APPLICABLE

THIS DOCUMENT MAY NOT SELL, CONVEY, TRANSFER, INCLUDE OR INSURE THE TITLE TO THE COAL AND RIGHTS OF SUPPORT UNDERNEATH THE SURFACE LAND DESCRIBED OR REFERRED TO HEREIN, AND THE OWNER OR OWNERS OF SUCH COAL MAY HAVE THE COMPLETE LEGAL RIGHT TO REMOVE ALL SUCH COAL AND IN THAT CONNECTION, DAMAGE MAY RESULT TO THE SURFACE OF THE LAND AND ANY HOUSE, BUILDING OR OTHER STRUCTURE ON OR IN SUCH LAND. (This notice is set forth in the manner provided in Section 1 of the Act of July 17, 1957, P.L. 984.) "Buyer acknowledges that he may not be obtaining the right of protection against subsidence resulting from coal mining operations, and that the property described herein may be protected from damage due to mine subsidence by a private contract with the owners of the economic interests in the coal. This acknowledgement is made for the purpose of complying with the provisions of Section 14 of the Bituminous Mine Subsidence and the Land Conservation Act of April 27, 1966." Buyer agrees to sign the deed from Seller which deed will contain the aforesaid provision.

### 18. POSSESSION (1-98)

(A) Possession is to be delivered by deed, keys and:

    1. Physical possession to a vacant building (if any) broom-clean, free of debris at day and time of settlement, AND/OR

    2. Assignment of existing lease(s), together with any security deposits and interest, at time of settlement, if Property is tenant-occupied at the execution of this Agreement or unless otherwise specified herein. Buyer will acknowledge existing lease(s) by initialing said lease(s) at time of signing of this Agreement, if Property is tenant-occupied.

(B) Seller will not enter into any new leases, written extension of existing leases, if any, or additional leases for the Property without expressed written consent of Buyer.

### 19. RECORDING (3-65) This Agreement will not be recorded in the Office for the Recording of Deeds or in any other office or place of public record and if Buyer causes or permits this Agreement to be recorded, Seller may elect to treat such act as a breach of this Agreement.

### 20. ASSIGNMENT (3-65) This Agreement will be binding upon the parties, their respective heirs, personal representatives, guardians and successors, and to the extent assignable, on the assigns of the parties hereto, it being expressly understood, however, that Buyer will not transfer or assign this Agreement without the written consent of Seller.

### 21. DEPOSIT & RECOVERY FUND (1-00)

(A) Deposits paid by Buyer within 30 days of settlement will be by cash, cashier's or certified check. Deposits, regardless of the form of payment and the person designated as payee, will be paid to Broker or party identified in paragraph 3(F), who will retain them in an escrow account until consummation or termination of this Agreement in conformity with all applicable laws and regulations. Any uncashed check tendered as deposit may be held pending the acceptance of this offer.

(B) In the event of a dispute over entitlement to deposit monies, a broker holding the deposit is required by the Rules and Regulations of the State Real Estate Commission (49 Pa. Code §35.327) to retain the monies in escrow until the dispute is resolved. In the event of litigation for the return of deposit monies, a broker will distribute the monies as directed by a final order of court or the written Agreement of the parties. Buyer and Seller agree that, in the event any broker or affiliated licensee is joined in litigation for the return of deposit monies, the attorneys' fees and costs of the broker(s) and licensee(s) will be paid by the party joining them.

Buyer Initials: _____      A/S-2K Page 6 of 8      Seller Initials: _____

(C) A Real Estate Recovery Fund exists to reimburse any persons who have obtained a final civil judgment against a Pennsylvania real estate licensee owing to fraud, misrepresentation or deceit in a real estate transaction and who have been unable to collect the judgment after exhausting all legal and equitable remedies. For complete details about the Fund, call (717) 783-3658, or (800) 822-2113 (within Pennsylvania) and (717) 783-4854 (outside Pennsylvania).

**22. CONDOMINIUM/PLANNED COMMUNITY (HOMEOWNER ASSOCIATION) RESALE NOTICE (1-00)**

☒ NOT APPLICABLE

☐ APPLICABLE: CONDOMINIUM
Buyer acknowledges that the Property is a unit of a condominium that is primarily run by a unit owners' association. §3407 of the Uniform Condominium Act of Pennsylvania requires Seller to furnish Buyer with a Certificate of Resale and copies of the condominium declaration (other than plats and plans), the bylaws, and the rules and regulations of the association.

☐ APPLICABLE: PLANNED COMMUNITY (HOMEOWNER ASSOCIATION)
Buyer acknowledges that the Property is part of a planned community as defined by the Uniform Planned Community Act. (See Definition of Planned Community Notice for the definition contained in the Act). §5407(a) of the Act requires Seller to furnish Buyer with a copy of the Declaration (other than plats and plans), the bylaws, the rules and regulations of the association, and a Certificate containing the provisions set forth in §5407(a) of the Act.

(A) Within _____ days of the execution of this Agreement, Seller will submit a request to the association for a Certificate of Resale and the documents necessary to enable Seller to comply with the Act. The Act provides that the association is required to provide these documents within 10 days of Seller's request.

(B) Under the Act, Seller is not liable to Buyer for the failure or delay of the association to provide the Certificate in a timely manner, nor is Seller liable to Buyer for any erroneous information provided by the association and included in the Certificate.

(C) Buyer may declare this Agreement VOID at any time before Buyer's receipt of the association documents and for 5 days thereafter, OR until settlement, whichever occurs first. Buyer's notice declaring this Agreement void must be in writing; thereafter all deposit monies will be returned to Buyer.

(D) In the event the association has the right to buy the Property (right of first refusal), and the association exercises that right, Seller will reimburse Buyer for all monies paid by Buyer on account of purchase price and for any costs incurred by Buyer for: (1) The premium for mechanics lien insurance and/or title search, or fee for cancellation of same, if any; (2) The premiums for flood insurance and/or fire insurance with extended coverage, insurance binder charges or cancellation fee, if any; (3) Appraisal fees and charges paid in advance to mortgage lender, if any; (4) Buyer's customary settlement costs and accruals.

**23. MAINTENANCE & RISK OF LOSS (1-00)**

(A) Seller will maintain the Property, grounds, fixtures, and any personal property specifically scheduled herein in its present condition, normal wear and tear excepted.

(B) In the event any system or appliance included in the sale of the Property fails and Seller does not repair or replace the item, Seller will promptly notify Buyer in writing of Seller's choice to:
1. Repair or replace the failed system or appliance before settlement or credit Buyer at settlement for the fair market value of the failed system or appliance (this option must be acceptable to the mortgage lender, if any). In each case, Buyer accepts the Property and agrees to the RELEASE set forth in paragraph 25 of this Agreement, OR
2. Make no repairs or replacements, and not credit Buyer at settlement for the fair market value of the failed system or appliance, in which case Buyer will notify Seller in writing within 5 days or before settlement, whichever is sooner, that Buyer will:
   a. Accept the Property and agree to the RELEASE set forth in paragraph 25 of this Agreement, OR
   b. Terminate this Agreement, in which case all deposit monies paid on account of purchase price will be returned promptly to Buyer and this Agreement will be VOID.

(C) Seller will bear risk of loss from fire or other casualties until time of settlement. In the event of damage by fire or other casualties to any property included in this sale that is not repaired or replaced prior to settlement, Buyer will have the option of rescinding this Agreement and promptly receiving all monies paid on account of purchase price or of accepting the Property in its then condition together with the proceeds of any insurance recovery obtainable by Seller. Buyer is hereby notified that Buyer may insure Buyer's equitable interest in this Property as of the time of execution of this Agreement.

**24. WAIVER OF CONTINGENCIES (1-00)**
In the event this Agreement is contingent on Buyer's right to inspect and/or repair the Property, Buyer's failure to exercise any of Buyer's options within the time limits specified in the contingency provision(s) will constitute a WAIVER of that contingency and Buyer accepts the Property and agrees to the RELEASE set forth in paragraph 25 of this Agreement.

**25. RELEASE (1-00)** Buyer hereby releases, quit claims and forever discharges SELLER, ALL BROKERS, their LICENSEES, EMPLOYEES, and any OFFICER or PARTNER of any one of them and any other PERSON, FIRM, or CORPORATION who may be liable by or through them, from any and all claims, losses or demands, including, but not limited to, personal injuries and property damage and all of the consequences thereof, whether now known or not, which may arise from the presence of termites or other wood-boring insects, radon, lead-based paint hazards, environmental hazards, any defects in the individual on-lot sewage disposal system or deficiencies in the on-site water service system, or any defects or conditions on the Property. This release will survive settlement.

**26. REPRESENTATIONS (1-00)**

(A) Buyer understands that any representations, claims, advertising, promotional activities, brochures or plans of any kind made by Seller, Brokers, their licensees, employees, officers, or partners are not a part of this Agreement unless expressly incorporated or stated in this Agreement.

(B) It is understood that Buyer has inspected the Property before signing this Agreement (including fixtures and any personal property specifically scheduled herein), or has waived the right to do so, and has agreed to purchase it in its present condition unless otherwise stated in this Agreement. Buyer acknowledges that Brokers, their licensees, employees, officers or partners have not made an independent examination or determination of the structural soundness of the Property, the age or condition of the components, environmental conditions, the permitted uses, or of conditions existing in the locale where the Property is situated; nor have they made a mechanical inspection of any of the systems contained therein.

(C) It is further understood that this Agreement contains the whole agreement between Seller and Buyer and there are no other terms, obligations, covenants, representations, statements or conditions, oral or otherwise of any kind whatsoever concerning this sale. Furthermore, this Agreement will not be altered, amended, changed, or modified except in writing executed by the parties.

(D) The headings, captions, and line numbers in this Agreement are meant only to make it easier to find the paragraphs.

**27. TIME OF THE ESSENCE-DEFAULT (1-00)**
The said time for settlement and all other times referred to for the performance of any of the obligations of this Agreement are hereby agreed to be of the essence of this Agreement. For the purposes of this Agreement, number of days will be counted from the date of execution, by excluding the day this Agreement was executed and including the last day of the time period. Should Buyer:

(A) Fail to make any additional payments as specified in paragraph 3; OR

(B) Furnish false or incomplete information to Seller, Listing Broker, Selling Broker, or the mortgage lender, if any, concerning Buyer's legal or financial status, or fail to cooperate in the processing of the mortgage loan application, which acts would result in the failure to obtain the approval of a mortgage loan commitment; OR

(C) Violate or fail to fulfill and perform any other terms or conditions of this Agreement;
then in such case, Seller has the option of retaining all sums paid by Buyer, including the deposit monies, 1) on account of purchase price, or 2) as monies to be applied to Seller's damages, or 3) as liquidated damages for such breach, as Seller may elect, unless otherwise checked below.

☒ Seller is limited to retaining sums paid by Buyer, including deposit monies, as liquidated damages.
If Seller elects to retain all sums paid by Buyer, including deposit monies, as liquidated damages, Buyer and Seller will be released from further liability or obligation and this Agreement will be VOID.

Buyer Initials: _____     A/S-2K Page 7 of 8     Seller Initials: _____

28. **BROKERS (1-00)** The Business Relationships between the Broker(s) and Seller and Buyer are as follows, UNLESS a different relationship is checked below:
- (A) The Listing Broker is Agent for Seller.
- (B) The Selling Broker is Agent for Buyer.
- (C) When the Listing Broker and Selling Broker are the same, the Broker is a Dual Agent. Dual Agency applies to all licensees, UNLESS there is a Designated Agent(s) for Seller and a Designated Agent(s) for Buyer. If the same Licensee is designated for Seller and Buyer, the Licensee is a Dual Agent.

A Business Relationship exists that is different from above, as follows:
- ☐ The Selling Broker is the Agent/Subagent for Seller.
- ☐ The Selling Broker is a Transaction Licensee.
- ☐ The Listing Broker is a Transaction Licensee.
- (D) Broker(s) may perform services to assist unrepresented parties in complying with the terms of this Agreement.

29. **MEDIATION (7-96)**
- ☐ NOT AVAILABLE
- ☐ WAIVED. Buyer and Seller understand that they may choose to mediate at a later date, should a dispute arise, but that there will be no obligation on the part of any party to do so.
- ☒ ELECTED
  - (A) Buyer and Seller will try to resolve any dispute or claim that may arise from this Agreement through mediation, in accordance with the Rules and Procedures of the Home Sellers/Home Buyers Dispute Resolution System. Any agreement reached through a mediation conference and signed by the parties will be binding.
  - (B) Buyer and Seller acknowledge that they have received, read, and understand the Rules and Procedures of the Home Sellers/Home Buyers Dispute Resolution System. (See Mediation Notice.)
  - (C) This agreement to mediate disputes arising from this Agreement will survive settlement.

Buyer and Seller acknowledge that they have read and understand the notices and explanatory information set forth in this Agreement.

Buyer acknowledges receiving a copy of this Agreement at the time of signing.

NOTICE TO PARTIES: WHEN SIGNED, THIS AGREEMENT IS A BINDING CONTRACT. Return by facsimile transmission (FAX) of this Agreement, and all addenda, bearing the signatures of all parties, constitutes acceptance of this Agreement. Parties to this transaction are advised to consult an attorney before signing if they desire legal advice.

WITNESS _____ BUYER _____ DATE _____
- Buyer Name (print) _____ SS # _____
- Mailing Address _____
- Phone #s _____ FAX # _____ E-Mail _____

WITNESS _____ BUYER _____ DATE _____
- Buyer Name (print) _____ SS # _____
- Mailing Address _____
- Phone #s _____ FAX # _____ E-Mail _____

WITNESS _____ BUYER _____ DATE _____
- Buyer Name (print) _____ SS # _____
- Mailing Address _____
- Phone #s _____ FAX # _____ E-Mail _____

Seller hereby approves the above contract this (date) _____

WITNESS _____ SELLER _____ DATE _____
- Seller Name (print) _____ SS # _____
- Mailing Address _____
- Phone #s 410-___-0401 FAX # _____ E-Mail _____

WITNESS _____ SELLER _____ DATE _____
- Seller Name (print) _____ SS # _____
- Mailing Address _____
- Phone #s _____ FAX # _____ E-Mail _____

WITNESS _____ SELLER _____ DATE _____
- Seller Name (print) _____ SS # _____
- Mailing Address _____
- Phone #s _____ FAX # _____ E-Mail _____

**Brokers'/Licensees' Certifications (check all that are applicable):**
- ☒ **Regarding Lead-Based Paint Hazards Disclosure:** Required if Property was built before 1978: The undersigned Licensees involved in this transaction, on behalf of themselves and their brokers, certify that their statements are true to the best of their knowledge and belief. Acknowledgement: The Licensees involved in this transaction have informed Seller of Seller's obligations under The Residential Lead Paint Hazard Reduction Act, 42 U.S.C. 4852(d), and are aware of their responsibility to ensure compliance.
- ☐ **Regarding FHA Mortgages:** The undersigned Licensees involved in this transaction, on behalf of themselves and their brokers, certify that the terms of this contract for purchase are true to the best of their knowledge and belief, and that any other agreement entered into by any of these parties in connection with this transaction is attached to this Agreement.
- ☐ **Regarding Mediation:** The undersigned ☐ Listing Broker ☐ Selling Broker agree to submit to mediation in accordance with paragraph 29 of this Agreement.

LISTING BROKER (Company Name) _____
ACCEPTED BY _____ DATE _____

SELLING BROKER (Company Name) _____
ACCEPTED BY _____ DATE _____

## DEPOSIT MONEY: NOTICE TO BUYER (Prior to Delivery to Listing Broker)

119

**DATE** May 28, 2000
**PROPERTY** 870 W. Street Road, West Chester, PA  19382

1. The Listing Broker is __Prudential, Fox & Roach Realtors__ , a Pennsylvania licensed real estate broker who is required to hold your sales deposit in escrow.

2. The  XX Buyer Agent  □ Transaction Licensee working with Buyer  □ Subagent for Seller is __Century 21 Alliance__ who is accepting your deposit on behalf of and for transfer to the Listing Broker.

If your deposit is in the form of a check, it is to be made payable to the Listing Broker.

WITNESS _____  BUYER _____  DATE _____

WITNESS _____  BUYER _____  DATE _____

WITNESS _____  BUYER _____  DATE _____

COPYRIGHT PENNSYLVANIA ASSOCIATION OF REALTORS 1995

Pennsylvania Association of
REALTORS®
11/99

# ADDENDUM/ENDORSEMENT TO AGREEMENT OF SALE

102-M

| | |
|---|---|
| PROPERTY | 870 W. Street Road, West Chester |
| SELLER | Robert J. Gleichert |
| BUYER | Len Polichuk and Surge Naumovsky |
| DATE OF AGREEMENT | May 24, 2000 |

Seller agrees to give Buyers first right of refusal to ~~the front lot~~, Lot 2.

~~Seller also agrees that when lots 1 & 2 are sold off that they will be for residential use only and the homes will be at least 3000 square foot.~~

The Seller will also be responsible for all costs pertaining to the moving of the driveway when the lots are sold.

This sale is also contingent on the Buyers walking the lots and accepting their layout with the Seller.

All other terms and conditions of the Agreement of Sale remain unchanged and in full force and effect.

| | | |
|---|---|---|
| WITNESS | BUYER | DATE |
| WITNESS | BUYER | DATE |
| WITNESS | BUYER | DATE |
| WITNESS | SELLER | DATE 5·20·00 |
| WITNESS | SELLER | DATE |
| WITNESS | SELLER | DATE |

**Pennsylvania Association of REALTORS®**
The Voice for Real Estate® in Pennsylvania

COPYRIGHT PENNSYLVANIA ASSOCIATION OF REALTORS® 1993
11/99

# DOMESTIC RELATIONS

## NOTICE TO BUYERS AND SELLER

In December of 1997, Governor Ridge signed into law legislation that allows overdue child support obligations to be placed as liens on property. All title companies now require a certification from the Domestic Relations Office of the County affected verifying that no unpaid support has been liened against the property.

The information provided below is required by the Domestic Relations Office in order to issue certification. There may be a nominal fee charged by the Domestic Relations Office that will appear on your settlement statement.

_870 W. STREET ROAD, W.C._
**Property Address**

_Chester_
**County**

---
**Name(Seller)**            X _Len Policoure_
                            **Name(Buyer)**

---
**Date of Birth**           X _6/22/63_
                            **Date of Birth**

---
**Social Security Number**  X _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_
                            **Social Security Number**

---
**Name(Seller)**            X _Serge Naunousay_
                            **Name(Buyer)**

---
**Date of Birth**           X _2/3/69_
                            **Date of Birth**

---
**Social Security Number**  X _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_
                            **Social Security Number**



# COOPERATING BROKER COMPENSATION LETTER

PROPERTY 870 W. Street Road, West Chester
BUYER Len Polichuk and Surge Naumovsky
SELLER Robert J. Gleichert

It is expressly understood and agreed by the parties hereto that:

Century 21 Alliance is the

☒ Buyer Agent ☐ Transaction Licensee working with Buyer ☐ Subagent for Seller;

AND

Prudential , Fox & Roach REaltors is the Listing Broker.

Listing Broker will pay a cash fee of $ 3% of sale price to the Buyer Agent/Transaction Licensee/Subagent for Seller identified above, when the fee is received by Listing Broker.

LISTING BROKER (Company Name) Prudential, Fox & Roach Realtors
ACCEPTED BY ____________ DATE ____________

COOPERATING BROKER (Company Name) Century 21 Alliance
ACCEPTED BY [signature] DATE 5-24-00

BUYER'S AND SELLER'S ACKNOWLEDGEMENT OF COOPERATING BROKER COMPENSATION:

BUYER ____________ DATE ____________
BUYER ____________ DATE ____________
BUYER ____________ DATE ____________
SELLER [signature] DATE 5·25·00
SELLER ____________ DATE ____________
SELLER ____________ DATE ____________

Pennsylvania Association of REALTORS® The Voice for Real Estate® in Pennsylvania

COPYRIGHT PENNSYLVANIA ASSOCIATION OF REALTORS® 1993
11/99

## ADDENDUM/ENDORSEMENT TO AGREEMENT OF SALE

102-M

PROPERTY 870 W. Street Road, West Chester
SELLER Robert J. Gleichert
BUYER Len Polichuk and Surge Naumovsky
DATE OF AGREEMENT May 24, 2000

Seller agrees to give Buyers first right of refusal to ~~the~~ ~~front~~ ~~lot~~, Lot 2.

~~Seller also agrees that when lots 1 & 2 are sold off that they will be for residential use only and the homes will be at least 2000 square feet.~~

The Seller will ~~also~~ be responsible for all costs pertaining to the moving of the driveway ~~when~~ the lots are sold.

This sale is also contingent on the Buyers walking the lots and accepting their layout with the Seller.

All other terms and conditions of the Agreement of Sale remain unchanged and in full force and effect.

| | | | | | |
|---|---|---|---|---|---|
| WITNESS | [signature] | BUYER | X | DATE | X |
| WITNESS | | BUYER | | DATE | |
| WITNESS | | BUYER | | DATE | |
| WITNESS | [signature] | SELLER | [signature] | DATE | 5-26-00 |
| WITNESS | | SELLER | | DATE | |
| WITNESS | | SELLER | | DATE | |

Pennsylvania Association of REALTORS®

COPYRIGHT PENNSYLVANIA ASSOCIATION OF REALTORS® 1993
11/99

Maria Naumovsky
826 Cherry Ln
Newtown, PA 18940


June 12, 2006


I would like to let you know that Sergey Naumovsky has shared certain information with me. I have separated from Serge in December 2003 .We have divorced in August 2004.

 In 2002 Len Polichuk and Serge bought property from Mr.Gleihert to help out (provide a place to live for him and his family) Jim Atkins, at the time, manager for Dunphy Nissan /Mitsubishi. The property consisted of a house on approximately two acres of land and adjacent four acres that will remain in Mr. Gleichert's possession. Serge said that Mr. Gleichert will subdivide four acres at a later date.  Serge has told me, while he was visiting our son in my home (I lived in Feasterville, PA in 2004) that property was going into foreclosure.

Andrew Mogiliansky, a friend and Serge's "partner" whom he has known for years, knew that the property is going for foreclosure. Serge told me that Andrew knew about the agreement between Serge and Mr. Gleichert regarding four acres of land pending subdivision, before the sale. Andrew offered Serge to purchase the property. In 2004 Serge has sold the property to Andrew.

 Serge and Andrew new each other since they were teenagers. Serge and I married in 1988 in Russia. In 1989 we were able to immigrate to United States. Andrew made it possible for us to settle in Philadelphia by becoming our sponsor through HIAS. Andrew and his father were kind enough to let us live with them for several weeks before we were able to rent an apartment on our own. Andrew proposed to Serge's sister and arranged for her to visit him in the States. During her stay he had changed his mind. Nevertheless Serge and Andrew stayed friends over the years. In January 2004 Andrew bought our house at 395 Worthington Mill Rd, Richboro PA 18954, where he is residing at the present time. Shortly after the sale of Dunphy Nissan and Dunphy Mitsubishi, Andrew offered Serge employment opportunity in his company. Serge has always referred to Andrew as "partner and to Andrew's office in Southampton PA as "their" office.

Sincerely,

Maria Naumovsky



## SETTLEMENT AGREEMENT

Made this 5th day of February, 2007 by and between Robert Gleichert (a/k/a GLEICHERT) and Andrew Mogilyansky (a/k/a MOGILYANSKY).

### WITNESSETH

WHEREAS, GLEICHERT and MOGILYANSKY have reached agreement to terminate Lawsuit Action No. 04-09179 in the Court of Common Pleas of Chester County under terms and conditions recorded in open court and on record. A copy of transcript of same is attached as Exhibit "A."

The terms and conditions are as follows:

1.     With regard to the Plan of Subdivision prepared by Kelly & Associates Inc. drawn on June 20, 1997 with a revision date of January 26, 1999, a copy of which is attached as Exhibit "B," GLEICHERT shall receive Lots 1 and 2, which are approximately four acres, but not Lot 3, nor any rights and entitlements associated with Lot 3 from this date forward, in return for payment, at the time of signing hereof to MOGILYANSKY of amount of One Hundred Twenty-Five Thousand Dollars ($125,000.00) good funds plus an irrevocable assignment of all rights and claims derived from and given by Judgment Note of July 11, 2000 (attached hereto as Exhibit "C") executed by Len Polichuk, Sergey Naumovsky, James Atkins and Teresa Atkins and, further, all rights and claims of any kind and any nature which GLEICHERT does have, can have or will have against Len Polichuk and Sergey Naumovsky, arising out of, or related to, real estate conveyance transactions affecting 870 West Street Road, West Chester, PA from year 2000 to this date and continuing.

GLEICHERT warrants that he has not and will not waive, release, satisfy or set off any debts, claims, costs, judgments, expense or the like which he may have and does here assign against Len Polichuk or Sergey Naumovsky, including such under the said Note. A copy of the Assignment of Claims is attached as Exhibit "D."

2.     GLEICHERT and MOGILYANSKY shall enter into an agreement of sale for real estate indicated as Lots 1 and 2 upon said Plan with settlement thereon to be on or before February 5, 2009, timing dependent upon time that final subdivision approval is granted for the

three-lot subdivision. The Agreement of Sale is attached as Exhibit "E." The parties agree that GLEICHERT may, for expediency, revise his application for subdivision to be a two-lot subdivision preserving however Lot 3 as currently engineered, to all extent possible. Lot 3 must be delivered substantially as engineered currently unless MOGILYANSKY consents, in writing, to changes from the Plan. The parties agree that GLEICHERT may record the Agreement of Sale but shall also cooperate to subordinate such rights as may appear of record or be otherwise known which would prevent or inhibit MOGILYANSKY from refinancing the current loan in the amount of Four Hundred Sixty Five Thousand Dollars ($465,000.00) for better rates. MOGILYANSKY agrees that at the time of closing on the transfer of Lots 1 and 2 to GLEICHERT, MOGILYANSKY will satisfy any mortgages then encumbering Lots 1 and 2 so that GLEICHERT can obtain clear title to those lots.

3.      If GLEICHERT does not obtain subdivision approval with such sufficiency as to create a separately alienable title to Lot 3 on or before two years hence, February 5, 2009, then either GLEICHERT may abandon his efforts to obtains subdivision or MOGILYANSKY may terminate those efforts. In either event, MOGILYANSKY will pay the sum of One Hundred Thousand Dollars ($100,000.00) to GLEICHERT, the Agreement of Sale will be cancelled and all necessary documents will be executed to allow MOGILYANSKY to retain title to the entire property, Lots 1, 2 and 3.

4.      GLEICHERT will pay for and indemnify and hold harmless MOGILYANSKY from any and all costs of subdivision and improvements required to complete the subdivision. MOGILYANSKY shall cooperate with GLEICHERT and use his best efforts to obtain, if necessary, the cooperation of James and Teresa Atkins and/or any other person with possessory ownership rights in the property in all matters related to securing subdivision approval.

5.      GLEICHERT will pay 25 percent of township and county taxes prorated as of February 5, 2007 as reimbursement immediately upon request of MOGILYANSKY.

6.      GLEICHERT shall file a Praecipe to Settle, Discontinue and End Action No. 04-09179 with Prejudice regarding all claims against MOGILYANSKY and without prejudice regarding all claims against Len Polichuk and/or Sergey Naumovsky. The Praecipe is attached as

2

Exhibit "F."

7.     The following documents will be executed by the parties in order to conclude settlement hereunder:

1.     This Agreement;

2.     Agreement of Sale for real estate designated currently as Lots 1 and 2 on Plan;

3.     Limited Power of Attorney for matters affecting 870 West Street Road to GLEICHERT from MOGILYANSKY;

4.     Assignment of all rights and claims of GLEICHERT under Note and generally against Len Polichuk and Sergey Naumovsky;

5.     Praecipe to Discontinue Action No. 04-09179; and

6.     Subordination of claims hereunder in favor of MOGILYANSKY, in order that the terms hereunder, if filed of record or otherwise disclosed, not prevent or inhibit such refinancing for better rates as MOGILYANSKY may attempt to obtain for Four Hundred Sixty-Five Thousand Dollars ($465,000.00) plus costs of the refinancing itself.

IN WITNESS WHEREOF, parties hereto, intending to be legally bound hereby do hereunder set their hands and seals on day and date indicated herein.

ANDREW MOGILYANSKY                    ROBERT GLEICHERT

3

## IRREVOCABLE ASSIGNMENT OF DEBT AND CLAIMS

I, ROBERT GLEICHERT, for good and valuable consideration as stated within the Settlement Agreement in connection with Action No. 04-09179 in the Court of Common Pleas of Chester County Pennsylvania (between Robert Gleichert and Andrew Mogilyansky) do hereby irrevocably grant, convey and assign to ANDREW MOGILYANSKY or his assigns all value, rights and claims derived from and given by Judgment Note of July 11, 2000 (attached hereto) executed by Len Polichuk, Sergey Naumovsky, James Atkins and Teresa Atkins and, further, all value, rights and claims of any kind and any nature which I do have, can have or will have against Len Polichuk and Sergey Naumovsky, arising out of, or related to, real estate conveyance transactions related to 870 West Street Road, West Chester, PA from year 2000 to this date and continuing including specifically but not limited to such rights as I may have for any judgments made, filed in court or to be filed from any suit or claims which I can bring, may bring or have brought.

AND I FURTHER do convey and grant to ANDREW MOGILYANKSY or his assigns any thing of value or amount I have received from the said Len Polichuk and/or Sergey Naumovsky from September 2004 forward to the date of the signing hereof as well as any amount or thing I receive henceforth from either or both of them which is within the scope of this assignment.

AND I FURTHER warrant and covenant, as a material part of the said Settlement Agreement, that I shall cooperate with all reasonable requests to prove, perfect and record such claims and rights as I here assign including cooperating in litigation with testimony and do grant, convey and assign all documents, papers, notes, records of any kind which could, in any way, pertain to such claims as I may have and do direct my attorneys, agents or employees to preserve and deliver all such material as may be in possession of myself, my agents, attorneys or employees as ANDREW MOGILYANSKY shall direct.

NOTHING HEREIN compels ANDREW MOGILYANSKY to act on my behalf.

1

IN WITNESS WHEREOF, I do herein set my hand and seal this 3 -14 09 day of
February, 2007.

_____ (SEAL)
ROBERT GLEICHERT

2